# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| **IN RE:** | § | |
| | § | **Case No:  22-31780-swe13** |
| **GEORGE DALE WIGINGTON** | § | **Chapter No: 13** |
| | § | |

## BRIEF IN SUPPORT OF DEBTOR'S MOTION TO AMEND JUDGMENT

TO THE HONORABLE U.S. BANKRUPTCY COURT:

COMES NOW GEORGE DALE WIGINGTON ("**Debtor**") who files this Brief in Support of Debtor's Motion to Amend Judgment.

## Table of Contents

ARGUMENT ........................................................................................................................ 2

Issue 1: RES JUDICATA ................................................................................................ 2

Actual Formal Knowledge of the Discharge Hearing........................................... 3

Response by Nationstar........................................................................................... 5

Knowledge of the Bankruptcy Proceeding ........................................................... 6

Application to Reference Cases .............................................................................. 9

Issue 2: PRIVITY .......................................................................................................... 17

Bound Via Concurrent Ownership at Time of Discharge.................................... 17

Nominal Binding and Successor Binding............................................................. 19

Issue 3: SHELLPOINT FAILED TO MEET BURDEN OF PROOF ................................... 20

Beginning Balance ................................................................................................... 24

First Payment ......................................................................................................... 25

Waiver of Notice of Assignment ........................................................................... 25

Invalid Foreclosure Fees Baked Into Principal Amount ......................................... 26

Issue 5: FEES ............................................................................................................ 27

Issue 6: ESCROW ..................................................................................................... 28

Issue 7: IMPOSSIBLE TO FILE TRANSFER OF CLAIM ....................................... 30

## Cases

*Brumfield v. La. State Bd. of Educ.*, 806 F.3d 289, 296 (5th Cir. 2015 .......................................... 3

*Carter v. Fenner*, 136 F.3d 1000, 1005 (5th Cir. 1998) ................................................................. 3

*Christopher v. Kendavis Holding Co.,* 249 F.3d 383 (5th Cir. 2003) ............................................. 3

*Estate of Haas v. Metro-Goldwyn-Mayer, Inc*. 617 F.2d 1136 (5th Cir. 1980) ............................. 26

*Grossie v. Sam,* 894 F.2d 778 (5th Cir. 1990) ............................................................................... 3

*Sequa Corp. v. Christopher,* 28 F.3d 512 (5th Cir. 1994) .............................................................. 3

**ARGUMENT**

**Issue 1: RES JUDICATA**

The Order frames this as a question of whether the third element of res judicata is met, but actually the Discharge Order clearly fulfills that element until and unless the Court grants relief to U.S. Bank under Rule 60(b)(4).

2 of 31

Rule 60(b)(4) motions are subject to de novo review as they "leave no margin for consideration of the district court's discretion as the judgments themselves are by definition either legal nullities or not." *Brumfield v. La. State Bd. of Educ.*, 806 F.3d 289, 296 (5th Cir. 2015 (quoting *Carter v. Fenner*, 136 F.3d 1000, 1005 (5th Cir. 1998).

The Court's analysis is centered on three cases: *Grossie v. Sam,* 894 F.2d 778 (5th Cir. 1990) (*In re Sam*), *Sequa Corp. v. Christopher,* 28 F.3d 512 (5th Cir. 1994) *(In re Christopher),* and *Christopher v. Kendavis Holding Co.,* 249 F.3d 383 (5th Cir. 2003)

*Actual Formal Knowledge of the Discharge Hearing*

In each of these three cases, the creditor had some knowledge of the overall bankruptcy case, but complained that they were not provided with formal notice (time, date, location, subject matter) of specific proceedings within the bankruptcy case. That is absent here, and it is fatal to U.S. Bank's affirmative defense. The Order cites no evidence in support of its finding that Nationstar did not have actual formal notice of the discharge proceeding. That is not surprising, because the record is totally devoid any evidence that Nationstar did not have actual formal notice of the discharge proceeding.

The record contains Tonya Tillman's testimony in the corporate deposition of Shellpoint stating that in regard to Nationstar's actual notice of the Reopening Order and the Notice of Intent to Issue Order of Discharge, Shellpoint (1) did not ask Nationstar whether it had actual notice, (2) did not request nor receive records indicating Nationstar had no actual notice, and (3) could not identify any person with knowledge that Nationstar had no such notice. Debtor Exh. D51 at 18:9 – 19:15. Regarding the same notice, Shellpoint's attorney stated that she did not know if Nationstar had such notice. Exh. D51 at 20:19 – 20:20. In Interrogatory No. 17, Shellpoint was asked to "[i]dentify any person with personal knowledge of Nationstar's notice or

lack thereof, with regard to: a. The fact that Debtor's Case 11-41092 in the Bankruptcy Court of the Eastern District of Texas was reopened on November 3, 2017, b. the pendency of Debtor's bankruptcy proceedings during the relevant time period, or c. the filing of Document 433 filed in Case 11-41092 in the Bankruptcy Court of the Eastern District of Texas. Shellpoint answered "**RESPONSE:** Neither Secured Creditor nor Shellpoint have this information." Exh. D49.

The record also contains evidence showing two plausible means by which Nationstar could have received an actual copy of the pertinent orders. The first is via Citimortgage. In its Notice of Appearance, BDFT&E stated that Citimortgage, the holder of the note and deed of trust, was servicing the mortgage for Freddie Mac and was authorized to file the Notice of Appearance on behalf of Freddie Mac, the investor. This notice indicated that the Freddie Mac Single-Family Seller/Servicer Guide (the Guide) was the servicing agreement. Exh. D6. Citimortgage was contractually obligated to forward the Reopening Order and the Notice of Intent to Issue Discharge to its assignee/successor in interest, Nationstar. Guide Section 7101.13: Funds and correspondence received after Transfers of Servicing (03/02/16) states "Within one day of receipt, the Transferor Servicer must deliver to the Transferee Servicer any funds for, or correspondence regarding, any of the transferred Mortgages and REO received on or after the Effective Date of Transfer." Exh. D139. The certificate of service shows that the notice was mailed to "Citimortgage, Inc., P O BOX 140609, Irving, TX 75014-0609" which is the same as the address for notices on the mortgage proof of claim. Exhs. D2 and D23. The second is via BDFT&E. BDFT&E filed the Notice of Appearance "as Counsel for CITIMORTGAGE, INC ITS ASSIGNS OR SUCCESSORS IN INTEREST . . . the holder of the note and mortgagee of record." The term "CITIMORTGAGE, INC ITS ASSIGNS OR SUCCESSORS IN INTEREST" includes Nationstar after it was assigned the deed of trust and servicing rights. It is completely

plausible that BDFT&E forwarded the Notice of Intent to Issue Discharge to Nationstar in fulfillment of its duty as counsel. Exh. D6.  The certificate of service shows that the pertinent notices were mailed to CitiMortgage, Inc., c/o BDFTE, LLP, 15000 Surveyor Blvd Suite 100, Addison, TX 75001-4417—the same address as on the Appearance Notice. Exhs. D6 and D23.

*Response by Nationstar*

Nationstar's actual formal notice of the pertinent documents is shown by its actions. First, Debtor's found his online access was terminated when he tried to logon on 11/7/2017 noting an active bankruptcy—this was just a few days after the order was entered and served on Citimortgage and BDFT&E. Exh. D87.  Nationstar stopped sending monthly statements while the case was reopened. Exh. D96. Nationstar filed a Request for Notices on 11/27/2017.  Exh. D26. Nationstar did not take any action to amend or vacate the discharge order before the final decree was issued on case was closed on 2/1/2018—eighty-seven days after Nationstar undoubtedly knew of the reopening of the case. Exh. D27. This is not the response of a party that has just had its due process rights violated. Nationstar did not raise a claim of no notice then, nor did it raise them in the adversary proceeding years later until prompted by the court. In the adversary proceeding initiated 8/23/2019, Debtor asserted res judicata and collateral estoppel based on the discharge order. Exh. D34. The issue of notice was first raised by Judge Rhoades in the hearing on the motions to dismiss held 6/16/2020. At no time prior to that hearing—more 953 days after Nationstar undoubtedly knew of the reopening of the case and 299 days into that litigation—did Nationstar or Select Portfolio ever raise the issue of notice in any pleading, brief, or any other filing. Exhs. D33 – D37. Nor was the issue raised in any discussion with Debtor. These actions reveal that the lack of notice claims is, and always has been, a post-hoc rationalization for Nationstar's unexplained failure to timely appear.

These also constitute circumstantial evidence that Nationstar actually received the pertinent documents (formal notice of time, date, and subject matter of the Notice of Intent to Issue Discharge) via one of the alternate methods because they all occurred shortly after the documents were issued on 11/3/2017. Exhs. D23 and D24.  If Nationstar learned of the reopening due to receipt of the Order Granting Motion to Reopen, then it is presumed that it also received the Notice of Intent to Issue Discharge because they were sent on the same day to the same recipients.

Shellpoint has not identified any other means by which Nationstar might have learned of the reopening other than the document itself. Shellpoint has not offered any rationale to explain Nationstar's lack of response to this purported violation of their notice rights. Shellpoint has not attempted to determine whether Nationstar actually received the pertinent documents even after this Court's not so subtle hint that such evidence would be required when—in response to Debtor's argument that there was no evidence of lack of notice from anyone with personal knowledge or other documentation—it asked counsel for Shellpoint whether she was going to call a Nationstar witness.

The analysis in the Order started with a presumption of no actual formal notice—without evidence to support the presumption—and only considered Nationstar's knowledge of the case. This is error and the Court should conduct the analysis included in the Order only after it determines that Nationstar did not have actual formal notice of the hearing on or before 1/7/2017.

*Knowledge of the Bankruptcy Proceeding*

The Order describes Nationstar's general knowledge of the bankruptcy case as perfunctory and found that at least one notice to Debtor's bankruptcy counsel explicitly referenced the proceeding, referring to a letter dated 2/4/2017 which stated the case number,

acknowledged that Mr. Mitchell represented the Debtor, stated that their records indicated an active bankruptcy case (825 days after the provisional close order was entered on ), and stated that the mortgage was 30 or more days in default. Exh. D69. This was 317 days prior to the discharge proceeding. That single notice proves more than perfunctory notice of the bankruptcy proceeding and it is just a tiny sliver of the evidence contained in the record. Twenty-one communications involving bankruptcy references are described below.

Even its very first communication to Debtor, the 8/29/2016 Notice of Servicing Transfer, Nationstar evinced robust knowledge of the bankruptcy proceeding. This notice showed that the mortgage was being handled in its bankruptcy department, and stated "Our records indicate the loan is currently in an Active Bankruptcy Status. If this information is incorrect, please contact us immediately at (877) 343-5602." Exh. D59. This was 666 days after the provisional close order and 476 days prior to the discharge proceeding.

Two days later, Nationstar's bankruptcy department sent Debtor a letter stating that the bankruptcy department was servicing the loan, listed the case number, described how payments in active, pending bankruptcy cases could be made, and copied Debtor's attorney. Exh. D65.

On 9/1/2016, Nationstar told Debtor during a phone call in which Debtor requested help getting online access to his mortgage account that online access was not available to him because his mortgage was involved in an active bankruptcy.  Exh. D128, DOC 215 100:16-22.

On 3/23/2017, after Debtor received the notice of default (Exh. D28), he called Nationstar and told them that the reason they were not receiving payments was because they had not filed a transfer of claim. He stated that the confirmed plan required him to send payments to the person listed on the proof of claim and that he would continue to do so until Nationstar filed a transfer of claim. Nationstar told Debtor that, if he wanted them to file something, he should

have his attorney contact their bankruptcy department/bankruptcy attorney. Exh. D128, DOC 215 102:10-103:6.

Between 2/25/2017 and 10/18/2017, Nationstar issued nine monthly mortgage statements which each contained the same three bankruptcy disclaimers. Two stated "Nationstar is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose. However, if you are currently in bankruptcy or have received a discharge in bankruptcy, this communication is not an attempt to collect a debt from you personally to the extent it is included in your bankruptcy or has been discharged, but is provided for informational purposes." The third stated "If this account is active or has been discharged in a bankruptcy proceeding, be advised this communication is for information purposes only and not an attempt to collect a debt. Please note, however Nationstar reserves the right to exercise the legal rights only against the property securing the original obligation." Exh. D96A-B. The first of these included a "Guide To Your Monthly Statement" which showed the non-bankruptcy version of a statement which had no such bankruptcy disclaimers. The disclaimers were aimed at two groups, those in active bankruptcies and those who had received a discharge. Since Debtor had not received a discharge as of that time, the implication is that Nationstar considered the case to be active.

Similar bankruptcy disclaimers referencing active bankruptcies or discharges were included in at least eight other Nationstar documents sent between 8/24/2017 and 6/202017: Mitigation Options (Exh. D70), Default Notice (Exh. D71), Dedicated Loan Specialist (Exh. D72), Trial Offer (Exhibit D74), Payoff Quote (Exh. D76), First Foreclosure Notice (Exh. D77), SCRA Letter (Exh. D79), and Second Foreclosure Notice (Exh. D 80).

This does not show perfunctory notice. This shows overwhelming and pervasive notice spanning over more than 15 months.

*Application to* Reference Cases

**Failure to List**

In each of the three reference cases, the debtor did not take action to get the creditor placed on the service list. In *In re Sam*, the individual debtor was required to list the pre-petition creditor on the schedules by the bankruptcy code and rules; however, the failure to do so was not fatal to debtor. In *In re Christopher*, the corporate debtor was required to list the pre-petition creditor, but did not. This failure was not fatal to the debtor, and the court decided (against the debtor) the matter on the issue of adequate constitutional notice, not on official formal notice. In *In re Sequa*, the court found that no bankruptcy code or rule required to the debtor to add the post-petition creditor to the service list and decided the issue on adequate constitutional notice not on official formal notice. Here, the creditor is a transferee who obtained its interest while the case was closed. Like in *In re Sequa*, here there is no bankruptcy code or rule requiring the debtor to add the transferee creditor to the service list. The question here is whether Nationstar had adequate constitutional notice and the lack of formal notice is a non-issue.

**Timeliness of Notice of Bankruptcy Proceeding**

In *In re Sam*, the court found a single notice of the bankruptcy case to an individual creditor's attorney 18 days prior to the bar date timely constitutional notice. In *In re Sequa*, two of the corporate creditors learned of the bankruptcy case in a meeting in December of 1987 and received a letter referencing the bankruptcy in January of 1988. *Christopher v. American Universal Ins. Group, Inc.* 148 B.R. 832, 834 (Bankr.N.D.Tex.1992). The district court's finding that this constituted timely constitutional notice for the confirmation hearing on 8/24/1989 (approximately 20 months later) confirmation hearing was upheld by the 5th Circuit. The length of notice of the bankruptcy case was not discussed nor determinative in *In re Christopher*.  Here,

9 of 31

Nationstar learned of the bankruptcy case more than 15 months prior to the discharge hearing with the bankruptcy case being raised in more than 20 communications with debtor. Thus, Nationstar's general knowledge of the bankruptcy case met or exceeded the requirements set forth in *In re Sam* and *In re Sequa.*

**Particular Circumstances of the Case**

The Christopher Court found that even timely general knowledge of the bankruptcy case does not always constitute adequate notice and noted that "adequate notice is notice reasonably calculated, given the factual circumstances, to **inform claimants of a proceeding that affects their rights**" and applied this fact-intensive analysis "to determine whether **[the creditor's] knowledge of the bankruptcy case** was sufficient to charge him with the burden of asserting his [legal rights]." This creditor knowledge centric analysis is basically the first prong of the *In re Sam* analysis – the notice apprised the claimant of an action affecting his rights.

**In re Christopher**

The Christopher Court stated "In these limited circumstances, perfunctory knowledge of the bankruptcy proceeding did not constitute adequate notice to satisfy constitutional due process concerns."

Christopher's knowledge consisted of reading about the bankruptcy case in the newspaper and receiving a letter, that did not mention the bankruptcy. stating that the termination of the pension plan would not affect his rights. The timing of these events was not discussed in the ruling. Two instances of communications relating to the bankruptcy is properly termed perfunctory. Twenty-one instances over more than 15 months is not.

The circumstances to which the ruling was limited include (1) an unrepresented individual creditor, an oilfield worker, (2) a debtor corporation with fiducial duties to debtor

10 of 31

when terminating the pension plan, and (3) a letter assuring debtor that his rights would not be adversely affected by the bankruptcy proceeding. The facts here are not close to those limited circumstances, the facts here are very nearly the polar opposite.

**Creditor**

Here, the creditor is a large, sophisticated financial institution with its own legal and bankruptcy departments. Christopher was an unsophisticated, unrepresented individual.

**Debtor**

Here, the Debtor is an individual. The debtor in *Christopher*, Kendavis, was a multi-national corporation with fiducial duties the participants in the pension program it was terminating.

**Communication**

Kendavis sent Christopher a letter assuring him that his pension benefits would not be affected by the bankruptcy. Here, the Court found that the Chapter 11 Plan "amounted to a promise by the Debtor that the claim would not be discharged until it was paid off according to the prepetition note." The same "promise" is made by every debtor with a confirmed Chapter 11 Plan so no Chapter 11 creditor can ever be burdened with participating in a discharge hearing. The term "promise" cannot bear the weight of that interpretation.

The actual communication here is the Debtor telling Nationstar that the reason they were not receiving payments was because they had not filed a transfer of claim and that Debtor would continue sending payments to the transferor until a transfer of claim was filed. Here, Debtor kept his promise, Kendavis did not. Here, Debtor's communication would tend to cause a reasonable creditor to enter the bankruptcy to protect its rights, Kendavis' communication tended to cause Christopher to not enter the bankruptcy to protect his rights.

Christopher knew of the bankruptcy case, but reasonably believed that the bankruptcy case was a proceeding that would affect his rights. Here, Nationstar is charged with knowledge of the Provisional Close order so it knew that the reopening of the case was the first step of the discharge proceeding. As of 11/7/2017—the latest date that Nationstar learned of the reopening—according to its records the mortgage was at least 22 months in default. No reasonable creditor would fail to understand that the discharge proceeding could affect it rights in these circumstances. The communication here was a call to action not an incentive to stand idly by.

**Reasonable Reliance**

The court found that Christopher, an unrepresented individual, reasonable relied on the assurance coming from his former employer with fiducial duties to him. Here, Nationstar could not reasonably rely on the communication here, even if it was the Chapter 11 Plan. Any assurance Nationstar had in the promises in the Chapter 11 Plan was negated when Debtor later told Nationstar that he was sending payments to their transferor and they had not received a payment for 22 months—any had never received a payment even from Debtor directly. The only payments Nationstar ever received were the four payments forwarded by Citimortgage. Debtor had emailed Nationstar's foreclosure attorney and told him that he was current on July 9, 2017 when Nationstar showed a six month delinquency. Exh. D114 p. 7. Debtor was also litigating the foreclosure in state court during the discharge proceedings, another reason reliance on the Chapter 11 Plan or Debtor was unreasonable.

**Burden**

The court found that Christopher should not be burdened with asserting his claim. Christopher was very likely unfamiliar with the bankruptcy process and would have had to hire

someone to file a proof of claim. Here, Nationstar is intimately aware of the bankruptcy process and has a whole team of lawyers who could easily enter the case and object to the discharge. Christopher had never had to file a proof of claim before; it is likely that Nationstar is in court every week objecting to discharges.

Exhibit D120 shows 79 filings, most transfers of claims, made in provisionally closed. Nationstar filed 11 of these, SPS filed 5, and Shellpoint filed 1. This indicate that the burden is not high.

**Debtor's Conduct**

None of the reference cases place any significance to the Debtor's failure to take action to place the creditor on the master matrix nor is the ruling based on any misconduct of the debtor. The most relevant was Kendavis' misconduct which consisted of terminating a pension plan trying to prevent pensioners from filing claims by assuring them that their rights were not at risk. This truly deprived creditors from asserting their rights. The *Christopher* court did not include this or the termination of the plan in its reasoning. Sam may have been guilty of police abuse, but that was not a factor in the decision there, nor was the fact that Sam failed to list a creditor that the code and rules required him to list. In *In re Sequa*, it seems Christopher, as a debtor-in-possession, possibly raided some entities and actively tried to hide his bankruptcy from post-petition creditors. The Sequa court recognized that the code does not always require all types of creditors be place on notice lists—there it was post-petition creditors—and did not fault Christopher for not listing the creditors when the code and regulations did not require it. In response to creditor's arguments that Christopher stole millions and did not deserve a discharge in the proceeding below, the N.D. Tex. Court noted that criminal sanctions were still available if warranted and "Second, and more important to this case, this court is obligated to rule upon the

law as it perceives the law to be. The court cannot allow the facts of a particular case, however appealing, to sway it from the path along which the law directs it." The fact specific context is centered on the creditor's knowledge, not the debtor's conduct unrelated to that knowledge. Debtor conduct was irrelevant to all the decisions in the reference cases, still this brief will address the Court's concerns.

The Order finds (1) Debtor never paid Nationstar, (2) Debtor obtained the 2017 Discharge Order by intentionally omitting Nationstar from the creditor-matrix mailing list, never otherwise serving Nationstar with any of the relevant documents, (3) misleading his bankruptcy counsel and Judge Rhoades to believe he had made all Chapter 11 Plan payments to Nationstar.

Before addressing these, it must be noted that Debtor believed and Nationstar stated and never retracted that the bankruptcy case was active. While the Court may rule that it was actually closed at that point, no one ever suggested that it was not active until years later. There are no cases on point, this is a case of first impression regarding provisional closures. No one has contended that Debtor's tender argument would not be valid if the case was active at that point.

**Failed to Pay**

Debtor told Nationstar why the payments were going to Citimortgage. There was no deception. The Court's finding that Debtor did not want to pay the mortgage is not supported by the record. Debtor took his position early on, at a time when there was no way he could have predicted this outcome.

**Omitting Nationstar**

Debtor's inaction cannot accurately be described as an omission. There is no bankruptcy code or rule that requires a debtor to add a transferee who obtained it rights while a case is closed. In fact, Rule 1009 precludes a debtor from amending list or schedule after the case is

closed. So, if the case was closed, Debtor could not have added Nationstar at that time. And if the case was open as Debtor believed, it was Nationstar's duty to file a transfer of claim. Either way, it was not Debtor's duty to add Nationstar to the service list.

Nationstar's omission was harmless, both in law and in fact. Official notice was not Nationstar's due, constitutional notice was. None of the reference cases base their reasoning on a failure to add a creditor, even when there is a requirement by code or rule. The record conclusively shows notice of reopening to Nationstar by 11/7/2017 and there is no evidence that this notice was not an actual copy of the pertinent orders forwarded either by Citimortgage or BDFT&E.

The record shows that Debtor attempted to send the pertinent order and notice to Nationstar on 11/7/2017, but was unable to do so because his account access was terminated because of an active bankruptcy according to the web page. Debtor could have changed course and mailed the documents instead of submitting them electronically, but did not. Debtor took the web notice as proof of notice to Nationstar making mailing unnecessary.

**Misled Attorney**

There is no evidence that Debtor misled his attorney. The record shows that Debtor consulted with his attorney after one or two of the mortgage payments was returned. There is no evidence that Debtor was advised that Nationstar was not required to file a transfer of claim before it could receive payments. There is evidence that Debtor did not tell his attorney that all of the payments were returned at the end of the case. But there is no evidence that Debtor hid this fact from his attorney. If his attorney agreed with Debtor's position, it was expected that there would be unclaimed funds at the end of the plan unless Nationstar changed its position. The record does reflect that Debtor's attorney did not call his position crazy. If his attorney disagreed

with Debtor's position, it would be very unlikely that he would have filed the reopening documents without first asking Debtor about it. The record simply shows that the issue was not specifically addressed.

Debtor requests the Court take judicial notice of the court records included in Exhibits D120 pp. 7-88, D121 pp. 1-31, D122 pp 1-126, and D124 pp. 1-34. D121 shows that there were 195 individual Chapter 11 cases filed in the Eastern District of Texas between 01/01/2009 and 12/31/2022. D120 shows that there were 79 transfers of claim filed in these cases while the case was provisionally closed, including 11 by Nationstar, 5 by Select Portfolio, and 1 by Shellpoint. D122 contains dockets for many of these cases showing that the case was provisionally closed at the time of filing. D124 shows sample claims registers showing that the court clerk processed these transfers of claims while the case was provisionally closed. D123 shows that the provisional close order in these cases was the same or similar to Debtor's provisional close order. These documents are relevant to show that it is possible that reasonable people believe that provisionally closed cases are not fully closed and that claim transfer are still required. Some may have considered it optional, but it is very unlike that all 79 filers considered it optional. They are also relevant to the magnitude of the burden such a filing carries.

**Misled Judge Rhoades**

The record contains no evidence that Judge Rhoades was misled. The Notice of Completion is a court provided form. It must be presumed that the court knew the difference between "tendered" and "completed" when it designed the form. Debtor provided the exact information the court required. Debtor's motion to reopen reports that all payments have been tendered. If those tenders do not constitute completed payments (under the refused tender rule), it is only because of the characterization of a provisionally closed case. An issue that did not arise

during the bankruptcy because Debtor believed the case was open and Nationstar consistently expressed a belief that it was open and never stated otherwise.

The difference between tendered and completed payments is also irrelevant to the discharge proceeding. A debtor is entitled to a discharge after they have tendered payment. Acceptance can not be a requirement for a debtor's discharge. This would allow a belligerent, or missing, creditor to delay or prevent a debtor's discharge. This does not align with the promise of a fresh start.

The impact on the creditor is minimal. The finding that all payments have been completed does mean that creditor loses their lien rights, but the discharge itself does not cause the creditor to lose its right to those tendered payments. A creditor has the right to the unclaimed funds under Section 347. Following a claim by a creditor for the unclaimed funds (tenders), a discharged debtor could be required to prove what payments were actually completed and account for the tenders that were refused or unclaimed. A debtor unable to do so would be susceptible to a Rule 60(b)(3) motion. These funds are available after discharge to creditors who act within the time limits of Section 347, Rule 60(b)(3), or applicable plan term.

**Issue 2: PRIVITY**

*Bound Via Concurrent Ownership at Time of Discharge*

The Court found that Nationstar was not bound by the discharge order against Citimortgage because it was not convinced that Citimortgage still had an interest in the mortgage at the time of the discharge order. The record contains a preponderance of evidence that Citimortgage did retain its interest through discharge.

On 8/1//2011 Citimortgage entered an appearance in Debtor's Chapter 11 as CITIMORTGAGE, INC. ITS ASSIGNS AND/OR SUCCESSORS IN INTEREST on behalf of

Freddie Mac. BDFT&E proclaimed to be counsel for CITIMORTGAGE, INC. ITS ASSIGNS AND/OR SUCCESSORS IN INTEREST.

Nationstar replace Citimortgage as servicer effective 8/16/2016 (Exh. 58) and was assigned the deed of trust on 8/25/2016. (DOC 191 3(d).) However, Citimortgage still retained an interest in the mortgage, Nationstar was sub-servicing the mortgage for Citimortgage. Nationstar representative Amy Parker told Debtor on 6/27/2017 that his mortgage was a Freddie Mac loan, that Nationstar was servicing the loan for Citimortgage, and that Citimortgage held the note. DOC 215 104:19-24, Exh. D129 10:00-11:30. This shows that there are times where different parties hold the note and deed of trust.[1] Exhibit D61 shows that Freddie Mac still owned the loan as of 6/23/2017. Note that the webpage did not identify servicers at that time. This shows that 10 months after Nationstar became servicer, and 6 months prior to discharge, Citimortgage and Freddie Mac retained interests in the mortgage.

The next ownership snapshot is 20 months after discharge. Exhibit D62 shows that Freddie Mac maintained its ownership at least through October 1, 2019. This screenshot is not dated but was taken at a point in time where Select Portfolio Servicing was sub-servicing the mortgage for Nationstar (Mr. Cooper), this had to be on 10/1/2019 or later when SPS began servicing the loan. Exh. D59. Nationstar assigned the deed of trust to SPS on 11/5/2019. DOC 191 3(e) p. 12.

The record does not contain direct evidence of Citimortgage's interest in the mortgage as of the date of the discharge order, 12/17/2017. However, three considerations demonstrate that it is more likely than not that Citimortgage retained its interest as of the date of the discharge order.

---

[1] This is not a split the note argument, and I make no such claim in this proceeding.

First, since the gap in ownership records is approximately 26 months. It is more likely than not that Citimortgage lost its ownership interest in the 20 months following discharge than in the 6 months prior to discharge. Second, Shellpoint was asked to identify the ownership interests throughout the life of the mortgage. Each servicer should have a record of the ownership interests in the mortgages they service, and if every servicer's record is incorporated into the subsequent servicers files as Shellpoint contends, the servicing record of Shellpoint should contain ownership interests throughout the term of the loan. Interrogatory No. 4 stated: "Identify each person who held any ownership interest in the mortgage debt with regard to Claim No. 5 that you filed in this bankruptcy case from the current date back to April 4, 2011. Include the dates on which any ownership interest changed hands. Shellpoint's response was "Secured Creditor obtained its ownership interest on March 22, 2022." Shellpoint's evasive response and failure to answer in good faith are sufficient to raise a negative presumption that a truthful answer would be detrimental to Shellpoint.

During this ownership gap, the only intervening event is the discharge. It is probable that this triggered Citimortgage's loss of ownership interest.

While the record does not contain direct proof that Citimortgage held an interest at discharge, it does contain direct evidence that Freddie Mac held an interest during the entire chapter 11. Citimortgage's notice of appearance indicates that it was prosecuting the claim on behalf of Freddie Mac and the record contains no evidence that Freddie Mac ever withdrew that authority. As such, the binding ruling against Citimortgage is binding on Freddie Mac and a binding ruling against Freddie Mac was binding on Nationstar as concurrent owners.

*Nominal Binding and Successor Binding*

The Court did not expressly rule on two other binding arguments of Debtor. Debtor requests the Court provide findings and conclusions.

First, the notice of appearance and the proof of claim was in the name of Citimortgage, Inc., its assigns and/or successors in interest. This definition includes Nationstar as assignee of the deed of trust. No one ever withdrew this authorization and apparent authority. Such a designation permits assignees of a contract to assume the benefits of a contract but they are also assigned the duties under the contract. Note that the POC did not include this additional "and assigns" term, it simply listed Citimortgage, Inc for receipt of Notices. It is undisputed that Citimortgage was on the certificate of service. Additionally, BDFT&E claimed to represent Citimortgage and the assignees and successors as well. It is undisputed that BDFT&E was on the certificate of service.

Second is the issue of binding by succession during a proceeding. Citimortgage held an interest in the mortgage at the initiation of the proceeding and it was transferred to Nationstar during the proceeding. The Court has previously rejected this argument based on the provisional closure bifurcating the proceeding into two separate proceedings with the transfer falling between the two procedures. Debtor respectfully requests the Court issue findings and conclusions on this issue.

**Issue 3: SHELLPOINT FAILED TO MEET BURDEN OF PROOF**

The testimony of David Rittenhouse conflicts with the testimony of Tonya Tillman and in day to day operations Shellpoint's employees are not able to rely on its business records.

The testimony of David Rittenhouse painted a glowing picture of Shellpoint's Finastra Fusing Servicing Director and Shellpoint's process of meticulously downloading, verifying, and

auditing new loans as they are boarded into Shellpoint's business records. Shellpoint relies on the information received from prior servicers to be reliable, trustworthy, and accurate. This information passed from servicer to servicer includes payment include payment histories, figures, and documents (DOC 216 145:19 – 146:6) and invoices (DOC 216 124:2 -124:21.)  The business records of the transferor servicer is incorporated into the transferee servicer's business records. Shellpoint relies on the prior servicer's records in Shellpoint's day to day operation. DOC 216 177:10 – 12. Mr. Rittenhouse verified that Shellpoint incorporated the reliable records from the prior servicer, Select Portfolio Services. DOC 216 145:15 – 146:6.

That sounds fantastic, having all those reliable records from the immediate prior servicer who incorporated reliable records from their immediate prior servicer, and so on and so on. Payment histories and invoices from today all the way back to the first payment. That would be great, but actions, testimony, and statements show that it simply is not true.

In a Rule 30(b)(6) deposition of a corporation, questions are propounded to the entity weeks in advance so the entity has time to designate and prepare a knowledgeable witness to speak on behalf of the entity. Here, Shellpoint had 15 days to designate and prepare Tonya Tillman. For the purpose of the deposition, "You" means "Newrez LLC" (Shellpoint). DOC 51 p. 47.

At the deposition on June 7, 2024, Tillman was asked for the total amount of the mortgage as of April 4, 2011, including the breakdown of principle, post-petition bankruptcy fees, uncollected late charges, escrow advances, escrow shortages, NSF fees, inspection fees, accrued late charges and attorney fees. This, and every other question at that deposition, had been given to Shellpoint over two weeks in advance. Instead of being able to rely on all that reliable business record data that is passed on and accumulated and incorporated by each

successive servicer. Tillman—as Shellpoint— responded "I do not have the business records from back then. I have Shellpoint's business records." Tillman was then asked "Are you testifying that you don't have accounting - - you don't have payment application records going back through the history of the mortgage? She answered "Not for the prior servicers, no." Ms. Morra added "At this point, no." Exh. D51 15:7-15:20. Asked "So do you know when the last pre-petition mortgage payment was made prior to the bankruptcy filing on April 4, 2011? Tillman answered "Not without those business records." Exh. D51 15:22-15:25. Asked "Do you have any records that indicate that 6 Nationstar did not file a transfer of claim in Case 1141092? Specifically, because the case was conditionally closed? Tillman answered "I don't have any of Nationstar's business records."

According to Mr. Rittenhouse, Nationstar's business records should have been incorporated into Select Portfolio's business records which should have been incorporated into Shellpoint's business records. The loan went active. That means all those tests and verifications passed. These tests can detect that all the business records from one of the prior servicers is missing.

Where is FINASTA?  Where are all those reliable business records Mr. Rittenhouse described. Those records that Shellpoint relies on for accuracy and trustworthiness on a day to day records. Mr. Rittenhouse verified that Shellpoint had indeed uploaded, checked, audited, and tested that data when it onboarded Debtor's loan.

Maybe FINASTA just had a bad day the day of the corporate depo. We know it provides reliable and accurate records. Right? Mr. Rittenhouse?

Interrogatories were propounded to Shellpoint on May 15, 2024. Shellpoint answered on June 26, 2024 stating these responses have been prepared pursuant to a reasonably diligent

inquiry for the information requested. They reflect information obtained by Counsel for Secured

Creditor, pursuant to a reasonably diligent inquiry conducted in connection with these discovery

requests in those areas where information is expected to be found. Just look in Finastra, right?

Different day, same results.

Interrogatory No. 7 asks for a detail of the mortgage debt as of April 4, 2011

including breakouts. Response: Secured Creditor did not have any ownership

interest in the loan as of April 4, 2011. Exh. D49 p5-6.

But Citimortgage did and they are in the servicing chain. They records are missing too?

Interrogatory No. 9 requested all payments credited to the mortgage since April 4,

2011 with breakouts. Shellpoint's response: Please see 16 page payment history

attached and labeled as Interrogatory 9. Exh D49 p6.

The payment history provided starts on October 7, 2019. Exh. SC13.

Interrogatory No. 10 requested Shellpoint identify interest added or accrued to the

mortgage since April 4, 2011. Shellpoint's response: Per the POC, the interest as

of the bankruptcy filing was $20,108.18. Exh. D49 pp. 6-7.

Interrogatory No. 11 asked for all fees, charges, and expenses charged to the

mortgage since April 4, 2011. Response: Provided these documents at deposition,

and attached and labeled as Interrogatory 11. Exh. D49 p7.

Shellpoint produced Exh. SC14. A list of 25 items totaling approximately $5,500 going back to

10/9/2019.

In practice, Shellpoint is not able to rely on its records. It has no invoices from any prior

servicer. It has ledger entries going back one servicer, Select Portfolio Servicing, to about

October 2019.

When Shellpoint's attorney needed evidence (invoices, mortgage statements), did she rely on Shellpoint's reliable, accurate records that reliably incorporate records of prior servicers? No, she printed off a screenshot from Dallas County Tax Collector (Exh. SC12) and turned to the Debtor's filing in a previous lawsuit. Exh. SC 10a-b. It appears that they entire servicing record that Shellpoint uploaded from the immediate prior servicer consists of page 15 and 16 of Exhibit SC13. Even this limited data is suspect, two entries show an effective date of 10/16/2019 for foreclosure costs assessed. This is suspect because there was not 2019 foreclosure.

**Issue 4: PRINCIPAL AND INTEREST**

*Beginning Balance*

Even if this Court rules that the discharge order is void, that just places Debtor back in the same position his was in on 12/16/2017. The debtor mortgage obligation was that provided for in the plan, for this issue it does not matter if that obligation is the note as amended by the plan or the plan which incorporates the note. As long as the Court does not hold that the note was not treated under the plan (and it probably is still binding), the deemed allowance of the claim pursuant to Section 502(a) is a binding judgment. Voiding the discharge order does not undo the confirmed plan nor the allowance of the claim. It is judicial "determination of the amount of such claim in lawful currency of the United States as of the date of the filing of the petition." This allowance established Debtor's liability on the mortgage as of the date of the petition, April 4, 2011 at $159,937.34. Exh. D2 Box 1. The plan treated the claim by providing that the allowed secured claim would be paid in accordance with the note . . . The plan provided that the lien would be retained only until their allowed secured claim including arrearage is paid in full. Exh. D10 §3.32. Debtor's liability on the note as of the petition date is established by the claim allowance process. Debtor's plan treated the claim by providing payment to satisfy the full

amount of the determined liability. Even if Debtor's Chapter 11 was dismissed, the judicial

ruling is still binding. Section 349(b)(2) only provides for vacating "any order, judgment, or

transfer ordered, under section 522(i)(1), 542, 550, or 553 of this title." Deemed allowance of

claims under section 502(a), and confirmation orders under section 1129 are not among those.

Shellpoint is clearly using the $169,618.18 from Citibank's 4/5/2011 monthly statement. Exh.

SC10b p. 237. Shellpoint referenced this statement in questioning Debtor. DOC 216 70:7 – 16.

*First Payment*

The petition in 11-41092 was filed on 4/4/2011. Exh. D p.2. Debtor made a payment via

Inwood National Bank Bill Pay program on 4/4/2011. Exh. D102 p. 1. Inwood's All-in-One

Retail Online Banking Services Agreement provides for a one or two day delay between the day

the bill payment is deducted from the payor's bank account to the day the bill payment is

received by the payee. Exh. D105 p.6 Section E 2nd and 3rd ¶¶. Debtor testified that the 4/4/2011

payment was credited to the account on 4/5/2011. DOC 215 95:10-17. The record shows that

Citimortgage did not credit the payment as of 4/5/2011. The 4/5/2011 statement lists Principal

Balance as 169,619.80 and Interest Year to Date of $2,856.69, the 5/17/2011 statement lists

Principal Balance as 169,619.80 and Interest Year to Date of $2,856.6. Exh SC10b pp. 235, 237.

This shows that no payment was credited between 4/5/2011 and 5/16/2011.

*Waiver of Notice of Assignment*

The Notice of Servicing transfer stated the effective date was 8/16/2016 and stated that

payments would be forwarded for sixty days after the effective date, 10/15/2016. Nationstar

accepted two payments after the 10/15/2016 date, on 10/25/2016 and 12/6/2016. When Debtor

made the EFT payment of $2,231.44 on 12/30/2016, neither Nationstar nor Citimortgage had

objected to Debtor paying Citimortgage.  Both Official Comment 3 to § 9-318 of the U.C.C.[2] and

case law, *Estate of Haas v. Metro-Goldwyn-Mayer, Inc.* 617 F.2d 1136 (5th Cir. 1980), require

objection by the assignee if the assignee desires to collect payments again after the waiver. *In*

*Estate of Haas*, the court found waiver after one payment without objection.

With the notice of transfer waived, Citimortgage was still a proper payee. Texas Business

and Commerce Code Section 4A.406 governs discharge of obligations by payment via electronic

funds transfers. Under §4A.406(b), a fund transfer discharges the obligation unless all four

conditions to are met:

(i)     the payment under Subsection (a) of this section was made by a means prohibited by the contract of the beneficiary with respect to the obligation,

(ii)    the beneficiary, within a reasonable time after receiving notice of receipt of the order by the beneficiary's bank, notified the originator of the beneficiary's refusal of the payment,

(iii)   funds with respect to the order were not withdrawn by the beneficiary or applied to a debt of the beneficiary, and

(iv)    the beneficiary would suffer a loss that could reasonably have been avoided if payment had been made by a means complying with the contract.

Here, Citimortgage withdrew the funds and mailed a check to Debtor. Exh. D101 p.1-2,

DOC 216 86:13-89:15.  Thus, the EFT payment was not refused and therefore discharged the

obligation to the extent of the payment. Whatever recourse Citimortgage had with regard to the

checks mailed, it was not to fail to credit those payments toward the obligation.

*Invalid Foreclosure Fees Baked Into Principal Amount*

---

[2] ("So long as the assignee permits the assignor to collect claims . . ., the account debtor may pay the assignor even though he may know of the assignment. In such a situation an assignee who wants to take over collections must notify the account debtor to make further payments to him.")

Invalid foreclosure fees have been charged to Debtor's account which have been debited from payments resulting in a principal balance that is inflated. Shellpoint has not even attempted to defend the foreclosure fees, but has attempted to declare that they are not included in the amount of the POC. That is simply false. The account ledger attached to Proof of Claim 4-1 include many foreclosure fees totaling $3,278.02. Exh. SC10a pp. 224-5.

| | | | |
|---|---|---|---|
| 8/30/2017 | $250.00 | 10/6/2017 | $50.00 |
| 8/30/2017 | $12.28 | 10/6/2017 | $50.00 |
| 8/30/2017 | $128.00 | 10/6/2017 | $215.00 |
| 8/31/2017 | $1012.50 | 8/20/2018 | $215.00 |
| 8/31/2017 | $12.28 | 8/20/2018 | $45.73 |
| 9/14/2017 | $5.93 | 9/19/2018 | $103.00 |
| 9/14/2017 | $103.00 | 9/27/2018 | $1032.50 |
| 9/14/2017 | $42.80 | | |

**Issue 5: FEES**

The Order states "[T]he fees U.S. Bank is claiming were incurred in 2019 and 2022, and the Debtor offers no evidence to connect those fees to Nationstar's first foreclosure attempt in 2017." This is error. As shown above, 2017 and 2018 foreclosure fees have already been charged to account. As shown below, there was no 2019 foreclosure.

There has been a total of four foreclosure attempts. Three by Nationstar, on 07/04/2017 (Exh. D78), on 8/1/2017 (Exh. D82), and on 10/2/2018 (DOC 191 at 3-ll.) Shellpoint attempted a foreclosure on 10/4/2022, but the record contains no evidence of this except for the fees included in the Fee List (Exh. SC14) and Payment History (Exh. SC13.)

The Fee List does show foreclosure and legal fees with an effective date of 10/16/2019 (Exh. SC14), however the record does not show a foreclosure attempt in 2019 so the foreclosure fees with the effective date of 10/15/2019 must be from either 2017 or 2018. Debtor's bankruptcy case 18-42231 was pending from 10/2/2018 to 8/20/2021. Exh. D28. No foreclosure could have been conducted without leave of the court.

The invalid notice of default mailed in early March 2017 meant that the purported acceleration was invalid. The right to foreclosure under the deed of trust does not arise until there is a valid notice of default and acceleration. Thus, all three of Nationstar's foreclosure attempt were in violation of the contract and property code. The only notice of default in the record is the one mailed on March 1 or 2, 2017. Exh D71. Thus, there is no record evidence of any valid notice of default or acceleration.

The only non-foreclosure fees listed in the Fee List are the nine $15.00 ($135.00 total) property inspection fees and the $150 and $506 bankruptcy fees. The Court show allow only these three fees, totaling $791.00.  Shellpoint did not provide any detail or invoice for the $180 fee listed as Prior Servicer Cost so there is no evidence that it is not also a foreclosure fee.

Shellpoint's attorney's statement that "they're (meaning 2017 foreclosure costs) not in there" is argument, not evidence. Mr. Rittenhouse did not testify that there were no 2017 foreclosure fees in the proof of claim. And while Ms. Morra is probably technically correct with respect to the Fee List, the are many 2017 foreclosure fees embedded in the principal balance calculation.

**Issue 6: ESCROW**

The partial loan history summary (Exh. SC13) shows the following costs.

| | | | |
|---|---|---|---|
| 1) | 11/30/2019 | County Tax Bill 1 | 1,728.47 |
| 2) | 11/30/2019 | County Tax Bill 2 | 882.67 |
| 3) | 11/21/2019 | Escrow Only Payment | 4,297.12 |
| 4) | 11/21/2019 | Escrow Only Payment | 1,897.49 |
| 5) | 11/11/2019 | Hazard Disb | 2,690.10 |
| 6) | 10/07/2019 | Escrow Only Payment | 9,999.99 |
| 7) | 10/07/2019 | Escrow Only Payment | 5,068.46 |

$$26,564.30 - 4,225.66 = 22,338.64$$

The escrow balance on the POC is $22,338.04 which is calculated by taking the total value of these seven items and subtracting the $4,225.66 in unapplied funds.

Shellpoint never produced a list of escrow items nor any invoices despite being asked for that information in discovery and promising to do so in their response to the objection to claim. As a result, I am unable to determine what items 6 and 7 are. The numbers are unfamiliar and seem to indicate that several items are conglomerated. These appear to be from shortly after Nationstar transferred servicing and I received no monthly statements from them from July 2018 to August 2019. Exh. 96A p.1. These could include foreclosure associated fees, costs to defend the state lawsuit to stop the foreclosures, or just be erroneous. It is inequitable to allow Shellpoint to withhold accounting and then permit it to base its claim on conclusory testimony that the totals are correct.

Debtor objects to allowance of items 1 through 5. SPS had no contractual authorization to pay these costs. The Chapter 13 Plan was confirmed on 4/22/2019. Exh. D30. The Chapter 13 Plan provides for Debtor to direct pay ad valorem taxes and insurance. Section 3.8 states:

> For all property that secures the payment of an indebtedness and which is proposed to be retained by the Debtor under this Plan, the Debtor must maintain insurance coverage as required either by the applicable contractual documents governing the indebtedness or as may be directed by the Trustee. The Debtor must also pay all *ad valorem* taxes on property proposed to be retained by the Debtor under this Plan as they come due in the post-petition period. Such payment shall be tendered to the appropriate taxing authorities in accordance with applicable non-bankruptcy law on or before the last date on which such taxes may be paid without penalty.

The Fee List indicates that Shellpoint paid the hazard insurance on 11/11/2019 and paid the ad valorem taxes on 11/19/2019 and 11/30/2019. Exh. SC 13 p.16. These payments were more than a month prior to the deadline. The hazard insurance was due on approximately December 22 and the ad valorem taxes were due on December 31. Exh. SC10A p. 404. The payment of these taxes was in violation of the Chapter 13 Plan and the automatic stay. Plan Section 8.1 states:

29 of 31

> 8.1 Section 7.1 of this Plan is deleted in its entirety. The Debtors residence, known as 2451 Elm Grove Road, Wylie TX and more fully identified in the deed recorded in Volume 2005001 Page 08521 of the Dallas County property records, will vest in the Debtor upon the filing of a Notice of Plan Completion by the trustee, in the absence of a court order to the contrary. All other property of the estate will vest in the Debtor upon confirmation of this plan.

Debtor testified that some of the taxes and insurance were included in his bankruptcy plans.

DOC 216 78:10-79:8.

**Issue 7: IMPOSSIBLE TO FILE TRANSFER OF CLAIM**

The Order states "Moreover, meaningful compliance with Bankruptcy Rule 3001(e)(2) was impossible, because the case had been closed at the request of the Wigingtons.". DOC 227 pp. 5-16. The Court excluded several of Debtor's exhibits, Exhs. D120-D126, on this issue because U.S. Bank stipulated that sometimes people file notice of transfers while cases are provisionally closed. DOC 215 78:18-23.

The Court has excluded evidence that such a filing is possible as irrelevant, and then included a statement that it is impossible. This is inconsistent. Debtor respectfully requests the Court either allow Exhs. D120-D126 or remove the statement.[3]

Submitted: October 20, 2025

/s/ George Dale Wigington
George Dale Wigington
Pro Se
State Bar No.: 24091665
Dalewig10@verizon.net
2451 Elm Grove Road
Wylie, TX 75098
469-235-1482

---

[3] In Issue 1: Res Judicata, Debtor requests the Court take judicial notice of the court filings contained in Exhibits D120-D124 as being relevant to the burden relative to filing a transfer of claim in a closed Chapter 11.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing has been served upon the parties in interest on the attached mailing list on October 20, 2025 by mailing a copy of same to them via first class mail or through the court's CM/ECF electronic mail (Email) system on the date below.


<u>/s/ George Dale Wigington</u>
George Dale Wigington


Tricia Ann Morra
Attorney for NewRez LLC d/b/a Shellpoint Mortgage Servicing
as servicer for US Bank Trust National Association, Not In Its
Individual Capacity But Solely As Owner Trustee for VRMTG
Asset Trust
*tmorra@raslg.com*